You still have to address the affirmative defenses. Attainted personnel action, even if sustained, transfers a heightened burden to the agency to show by clear and convincing evidence that they would have taken that action independent of the protected disclosure that contributed to it. So the affirmative defense of whistleblower reprisal needs to be addressed if you sustain the charges, if you decline or affirm his denial of due process, and also the penalty analysis. So as I mentioned under the WPEA, because the judge found that his protected disclosure contributed to his removal, the agency bore the heightened burden to prove by clearly and convincingly it would have removed him regardless of his protected disclosures. And we contend that the administrative judge's analysis both contained legal error and factual findings that were not well-reasoned in light of the well-developed record before you. Under CAR Factor I, the administrative judge was required to consider the strength of the evidence in support of his personnel action and found for the agency by referring generally to his earlier discussion for why he sustained the charges and then noting the quantity of the materials that were before Mr. Gibson at the time of the removal and stating that the volume before Mr. Gibson contained some unidentified materials which established Mr. Robinson's negligence. That was the whole sum of his CAR I analysis. In the red brief, the government notes that A.J.'s decision or reference to his earlier discussion of the charges is sufficient because there's no need for the judge to repeat his detailed or his analysis for the charges in his CAR I analysis. And we contend that should this Court adopt that position, it essentially has made CAR I unnecessary and that cannot be the purpose of CAR I. Sustaining the charges is a different legal analysis for a different purpose. In this case, it entails a de novo review of the evidence and a preponderance standard. And CAR I is to analyze the strength of the evidence to see whether or not it is so strong it clearly and convincingly meets the heightened burden for the agency to show it had independent causation. The administrative judge erred by relying upon the fact that the materials before Mr. Gibson were voluminous, but he never goes into addressing the quality of the evidence before him. And if you review the well-developed record, you can see that much of the evidence that was before Mr. Gibson and indeed before the administrative judge contained missing elements. Actually, the substantial portion of each specification in Charge I and II, they were never part of the evidence file or else they were redacted. And they were never introduced by the agency at hearing. As this Court stated in Whitmore, the administrative judge should also consider the evidence that fairly detracts from the conclusion that there was an independent causation. And we contend that the administrative judge ignored the overwhelming evidence that showed that the evidence used to support the removal against Mr. Robinson was weak. For example, the materials used to support the removal of Mr. Robinson contained transcripts of IG testimony that had exculpatory missions by subordinate employees. They were a couple levels down from Mr. Robinson, who blamed themselves, these subject matter experts blamed themselves for the scheduling issues at Phoenix. There was also evidence of similar conduct. Can I just ask on that point, does the charge of negligent supervision really get weaker because the employees that were supposed to be supervised fess up to making a mistake? That's what careful as opposed to the opposite, I mean, non-negligent supervision would have, in the AJA's findings, should have known about and prevented. Well, what's interesting about that is that they admitted their culpability, their direct culpability in the scheduling issues at Phoenix. Why does that truly weaken the case for negligent supervision? Sure, because under, inherent under the Miller analysis at the MSPB, Miller versus I think it's Department of HHS, a supervisor can be held liable for the misconduct of the subordinate. But that's presuming that the agency views that subordinates have actually engaged in misconduct. And proof of that would be perhaps discipline of that subordinate or removal of that subordinate. And here, the subordinates who admitted culpability were promoted or not disciplined at all. So that goes to the perception that the agency had that their actual actions, their performance of their duties that led to these scheduling issues was not viewed as misconduct by the agency. And weakens the case that the supervisor should be held for conduct of subordinates who were never disciplined for their actions. And indeed, nationwide, there's evidence that... You lost me on that. Uh-huh. So are you saying that an official, a supervisor, cannot be disciplined because of the negligence of the subordinates? No, but what I'm saying is that... Even where the subordinates acknowledge their own negligence and say, take responsibility for it? No, but as opposed to the strength of the evidence of independent causation, if the agency never viewed the subordinates to have engaged in actual misconduct such that they were disciplined, or otherwise, or there's evidence that their admissions led to some sort of maybe a performance downgrade, then sure, the supervisor should, depending on under the Miller factors, be held liable for those subordinates. But here, nobody viewed those subordinates to have engaged in any misconduct. That's the problem, isn't it? I mean, you have all these scheduling problems that are just growing in scope, and the subordinates aren't being disciplined, and the supervisor, Ms. Robinson, isn't either. I mean, I don't understand your argument. In this situation, why the supervisor would not be negligent? Well, the knowledge of the subordinates' actions took place when the IG came in, after the false allegations arose from Congressman Miller. So to the extent they weren't disciplined beforehand, there was no knowledge on behalf of Mr. Robinson that they were shoving paperwork in a drawer or not pulling up emails. The knowledge came after Mr. Robinson had been placed on leave. That's when the agency obtained knowledge that these low-level subordinates were not performing their job duties. So in that case, my argument is that those subordinates, upon learning in May, June, and subsequent time in 2014, if the agency actually viewed what they had done to have been wrong, to put things in drawers or not respond to emails or put people on the EWL, then they would have been disciplined. But they were not. They were promoted. They were reassigned. They just went about their various lives. There were other Phoenix VA officials that were removed along with Mr. Robinson. Is that right? Correct, at different points in time. So there were three other persons that would be under the CAR-3 factor that were removed. Ms. Hellman was removed in December of 2014 under the old Title 38. However, the Board did not sustain the scheduling issues for which she was removed upon appeal. Mr. Curry was removed shortly after Mr. Robinson, actually at the same time as Mr. Robinson, after Mr. Robinson submitted testimony to Congress about Dr. Shulkin's inaccurate testimony at the field hearing. And I guess are you saying Mr. Robinson just didn't have any notice about any problems before 2014? No. The reason why he went to Phoenix in 2012 was because for 20 years Phoenix was wide known as a hospital with increasing enrollment. In 2012, they had 83,000 unique patients come to Phoenix, but they had no EWL. They had workarounds. It was Ms. Bowers, who was the visiting director, who hired the team in 2012 and 2013, including Mr. Robinson, to try to resolve what had been longstanding monetary and scheduling issues going back to, I think it was the 90s, when the decision was not to expand the campus and keep it landlocked. So he was quite aware. Everyone knew that they were not on the EWL, all the way up to then-Secretary Shinseki's office, when Ms. Bowers would report on the status of the VISN, including Phoenix. So this was the IG knew, Congress knew, everyone known for years. Did he know that as he was working to fix the scheduling issues that people were sticking things into drawers? No, no he didn't. Everybody knew that there were problems at the VA facility, correct? Everyone knew that there were problems in VHA. Except for Ms. Robinson? No. Except for Ms. Robinson? No, that's not at all what we contend. In fact, the opposite. Congress and the VA knew that there were problems within VHA writ large, at least since 2005 with the first IG report that talked about how there were workarounds with scheduling issues. I think it was VISN 3 on the East Coast. So certainly one of the things that Mr. Robinson did in the 27th year of his career was decide to tackle Phoenix, to make it a better facility, because it had a reputation for, quite frankly, being a mess. Why don't you get to the due process argument, because you're running out of time. Sure. So, as you know, we contend that beginning in May of 2014, statements were made by Mr. Is it lack of due process pre-termination or post-termination? It's pre-termination. Was the due process problem the opportunity to be remedied post-termination? No, under Loudermill, a post-termination remedy that was allowed for the employee in Loudermill was not sufficient to overcome the pre-termination lack of meaningful opportunity to present a reply to the allegations to the decision maker. And in Caperton... Your argument is that he did respond, but the decision was made before that response was taken into account. Decision was made, yes. And the decision was made at the time before the first proposed removal was issued, at the end of May of 2014. If we were to send this back on the due process issue alone, how did your client win at the end of the day? What happens if we send it back for due process? They're going to look at his response? No, what happens is that it goes back to the agency. If you find a due process violation, then he gets reinstated. The remedy is to have a constitutionally proper process. So they could certainly re-propose... Is that forward-looking? That is, he would be reinstated into his job as of 2014? No, he'd get reinstated as if the unconstitutional process had not occurred, so it's retroactive. Yes, I'm sorry, yes, to 2016. He was on administrative leave for 18 months. Oh, I got the two years wrong. Okay, 2016, and so then it would be 2018, and then you're saying they might remove him again... They can. But there's no inquiry into whether, had there been due process in the pre-termination 2016 proceeding, he still would have been removed, and so no retrospective relief. No, he... You say he gets his job back. And retroactive relief, and then the agency can determine that is sort of the injunctive relief, if you will, with the constitution violation. So you get to be made whole because of the constitutional violation. So he would get his job back as of, I believe it was sometime in June of 2016. Administrative leave, what happens then? There's a rehearing to take into account his response? No, usually what happens is then the agency re-proposes. So there would be a new proposing slash design official. Maybe they would change up the charges. It's basically a do-over, and then he has an opportunity to respond to... It's a whole new proceeding. It's a whole new proceeding. And what would it be about that new proceeding that would give you comfort, that now there wouldn't be a due process violation, given your claim that there was a due process violation back in 2016? Well, part of our... Well, it would depend on who the decision-maker was. If it was instead of the deputy secretary, it was, in the normal course of business, perhaps someone down in his chain of command, the medical center director. If there's more normal facts and circumstances, due process is an objective analysis. So you look at the facts and circumstances surrounding the actions. So I don't think the VA is looking for my advice, but I'd treat them like a normal GS-15, like they do in other circumstances, and maybe decide not to remove them because, as you know from our CAR-3 analysis, and also in our due process, they chose not to remove so many other supervisors. In fact, no other supervisors elsewhere in the nation, despite the plethora of evidence. Some of whom resigned? No. The judge relied on unsupported testimony from Mr. Gibson about that and then pointed to two individuals to support Mr. Gibson's testimony that people resigned before they could be fired. And one was Ms. Bowers, and one was Ms. Claflin, the nurse at Phoenix, and Ms. Bowers was the visiting director. There's no evidence that they were ever under investigation. There's no evidence that they had ever engaged in misconduct. Can I ask you one quick question? Was Dr. Shulkin a supervisor of Mr. Gibson? No. They were not in some chain in which Shulkin was above Gibson? Dependent on who you ask. When I asked Dr. Shulkin at deposition, he said he reported to the secretary. He was deputy at the time? No, he was the undersecretary for VHA. But when I asked Mr. Gibson, he believed that Dr. Shulkin reported to him, and he reported to the secretary. So Gibson thought Shulkin reported to Gibson, not the other way around. Yes. Gibson was the self-described chief operating officer of VHA. Okay. VA, sorry. Okay. Good morning, Your Honors. May it please the Court. This case is about accountability for serious failures at the top of the Phoenix VA Medical Center. The case was heard by a very experienced administrative judge of more than 30 years with the MSPB who determined that the charges were sustained. What happens if we were just to say that we were to affirm on the negligence and then remand or reverse on the due process affirmative defense? If the Court affirms the charges but finds there's been a due process violation, that's the constitutional violation and Mr. Robinson gets his job back and the agency can choose whether they want to remove him all over again. That's the answer. So if they want to remove him, they've got to start the process? If the Court finds a due process violation, yes. Of course, in this case, we would argue there is no due process violation. The petitioner, Mr. Robinson's attorneys, have raised due process and made a couple of different types of arguments that tie into that. The first one is that Mr. Robinson's response was not given meaningful consideration by Mr. Gibson and the administrative judge addressed that and that specific claim basically turned on a credibility determination. Do you agree that the Constitution required Mr. Gibson to give meaningful consideration to the response? Yes. Cleveland v. Loudermill requires, it's minimal. It is an opportunity. So the opportunity to respond has to be something other than empty. Exactly. It has to be some kind of opportunity to respond that's actually heard. But in this case, that issue alone, that single strand of the due process argument, really turned on a credibility determination. Mr. Gibson testified. About what he said to the New York Times. No, no, that's a separate argument. It's about what Mr. Gibson testified about how he went through the evidence. He testified before the administrative judge at quite a lot of length. He testified about what he did, how many hours he spent, what his thought process was. Mr. Robinson? I'm sorry. I misspoke. Of course I'm talking about Mr. Gibson. Yes. Mr. Gibson testified for quite a long time. His testimony encompasses some 250 pages. He went through his entire process of what he considered, what was important to him, how he understood the charges. Doesn't that raise a due process issue in that the analysis seems to be built entirely on Mr. Gibson's allegations and claims? Not at all, Your Honor, because the allegation is that Mr. Gibson didn't meaningfully consider Mr. Robinson's response. Only Mr. Gibson could address that and testify credibly, according to the administrative judge, as to what consideration he gave it. So that was sort of one strain of the due process argument that Petitioners raised, and that really, that part of it turned on a credibility determination. A second argument had to do with Where does the A.J. point in Mr. Gibson's testimony or his information that indicates that he took under consideration Mr. Robinson's response? All right. So that is in the administrative record at Appendix 52. And he addressed Mr. Gibson's testimony specifically. Gibson testified that he spent several weekends pouring over the, quote, pouring over the evidence. He stated that he, quote, on disciplinary matters, recognizing that they affect not just the agency, but also the appellants, and that he did not take this case lightly. He quotes Mr. Gibson quite a lot. He took his evidence to review the evidence, including the appellant's response, and granted the appellant's request for an extension to respond, showing that he was willing to deliberate at his own pace and resist any complaints about delays. He testified that he did not predetermine the outcome of the case and gave it a lot of deliberation. This continues. I found Gibson to be a thoughtful, credible witness. In addition, I note that he did not sustain one of the specifications in Charge 3. I find that he considered the record as a whole and kept an open mind. So that, again, goes to one strand of the due process argument that Petitioners raised. Petitioners also raised the idea that the administrative judge applied an incorrect test, but the administrative judge applied the test that's been applied by the board. You brought the comment to the New York Times that predated the removal, but the comment that Ms. Robinson was going to be removed. Right. So there's sort of two aspects to that. One also ties into credibility, because Mr. Gibson emphatically denied having made that statement. And, in fact, I have to quote what he said in his testimony, because it's sort of very memorable. He said in direct response to whether he had made that statement. Page, page, page. Appendix page, yes. 10740 of the administrative record. Oh, I'm sorry. Is that a joint appendix number? That is a joint appendix, yes. 10740. 10740. He was asked about the New York Times article. He was specifically asked about whether he made that statement. He emphatically denied saying it, saying, quote, this isn't my first rodeo. I've got more sense than that, close quote. A reference to the fact that Mr. Gibson has risen through the ranks. He became, obviously, CEO of the VA. This is not his first time removing someone he knows well enough not to prejudge and certainly not to tell the New York Times that he prejudged something. And, again, the administrative judge credited his testimony that he did not make that statement to the New York Times, did not prejudge the case, came at the case, granted his extension, and the administrative judge found that he gave meaningful consideration to his reply. He also considered the alternate due process argument that the petitioner had made, which was that the environment, because of statements by the President and statements by Congress, created an environment so that the risk of unfairness was intolerably high. The administrative judge applied that test and looked at each of those statements that were identified by the petitioner and found that all those statements, those of the President as well as the Congress members, simply indicated that individuals who were found to have committed wrongdoing should be removed, but they didn't prejudge whether Mr. Robinson, in fact, had committed wrongdoing. That was the issue before Mr. Gibson as the proposing and then deciding official. That was the decision that he made, and then, of course, that was the question that was reviewed by the administrative judge. Do I remember right that there is an additional due process contention that rests on the fact that Mr. Gibson decided to be the deciding official himself in 2016, whereas in the first round in 2014, there was separation between the proposing official and the deciding official, and that was a way of ensuring that the desired result was going to be achieved? There is an argument about that. There's really no evidence, so the petitioner characterizes that as indicative that there wasn't going to be. Is there any general problem with the proposing official being the same? No. There have been other cases before this Court where the same individual has served as the proposing and the deciding official, and they've been sustained.  It is more often done the other way, but we have to remember, in this case, I think I heard counsel suggest that in normal cases it would perhaps be the director of the medical facility, Mr. Robinson's supervisor, who would be the proposing official. But, of course, in this case, that was Ms. Hellman, and she had already been removed. So it was not unusual in that instance, absent the immediate supervisor, for Ms. Gibson to come into the situation and say, I'm going to take control, I'm going to be the proposing official, make sure that this is looked at carefully, and then it would be, I think having made himself the proposing official, it actually would have been a little bit odd maybe to make somebody, I mean, he at that point was the acting secretary, I think, of the VA, to make somebody else the deciding official, maybe put them in the weird position of having to overrule someone much higher than them. So, again, it's not, I think it's more often that you have a different person than proposing and deciding, but it happens that there is the same person that is the proposing and the deciding official. This was a high visibility case. It was a person involving a very high level person. So I think Mr. Gibson, he stated that he just decided to do that. There's really nothing in the record that explains exactly why he decided that. He just wasn't asked that, I guess, by either counsel. And just the fact that he did that doesn't suggest any impropriety. Can I ask you about, you just mentioned high visibility. I guess another word for that is notoriety, which I think is discussed or itemized in Douglass. Can you explain why that ought to count in the penalty? And don't just say Douglass says it. That was going to be my first answer. It was. What was the explanation? I can conjure some, but I guess I'm not interested. Right. Because there's obviously something of a danger that when the media and the politicians get highly concerned about something, maybe pressures are felt that might divert one from a clear-eyed, fair course. Right. And I think due care has to be paid to make sure that that doesn't happen. And if there was evidence of that happening, that would be a bad thing. But on the other hand, I think that it is right that Douglass includes that as one of those factors. It is appropriate that when a particular act of misconduct brings really shame upon an agency, I mean, this is our federal government. We want our citizens to be able to look up to our federal government, be proud of it. And it is harmful to the agency's ability to be effective going forward. If nobody trusts it. Yes, that's a much better way of saying it. It's going in that direction, but yes. And so I think it is fair to consider that, as long as due care is also taken to make sure that that just didn't result in undue pressure to take a removal that would be otherwise inappropriate. Can I change the topic and ask you to address one aspect of the whistleblower reprisal claim? In particular, counsel focused on the administrative judge's reasoning to find that it was clear and convincing evidence that this action would have been taken even if Mr. Robinson had not criticized Dr. Shulkin's testimony to the Senate. And the administrative judge finds, now I can't find the page, but says Gibson had no motive to retaliate because the criticism was of Shulkin, not Gibson. I guess this is on page 48 of the appendix. That seems curious. I mean, a highly, highly placed official in the department is accused of making misrepresentations or inaccuracies, I forget the exact, to the overseeing legislature. And another high-ranking official doesn't have a motive to protect the institution by going after, just doesn't have a motive on that one particular finding, to take action against the person who's harmed the institution by going against, not him personally, but somebody comparably of high stature in the institution. With all due respect, I think that is a bit of a stretch. Perhaps I would suggest that the disclosure was a very, very specific disclosure. It wasn't, you know, Secretary Shulkin, Mr. Shulkin is doing a really bad job, and the VA is doing a really bad job. He didn't talk to me because either OIG or DOJ was investigating or something like that. Was that the? It was a very specific statement that Mr. Shulkin had made about the date that they, that saying that the VA could not interview Mr. Robinson because the OIG investigation was still ongoing, but in fact, according to Mr. Robinson, and I think it's true, the date it had ended. So it was a very specific misstatement. There was a criminal investigation from DOJ also involved, right? I'm sorry, Your Honor? There was a criminal investigation, a DOJ criminal investigation? There was, and for that reason, the administrative judge actually said, I'm not even sure that I agree that Mr. Shulkin was inaccurate in his testimony to Congress because there were these other investigations going on. But that investigation was over also. And apparently the evidence shows that the officials knew that that investigation had been closed. No criminal action was taken against him. There were three different investigations that were ongoing. There was the OIG investigation, there was a DOJ investigation, and then there was an OAR, Office of Accountability Review investigation, which was sort of an internal agency investigation. I don't recall whether all three of them were done, but again, because the Shulkin's testimony referred specifically to the OIG investigation, but there were these other ones, the administrative judge said, I'm not even sure I would find that this was an inaccurate statement or a misrepresentation to Congress. But if it was, it was a very specific disclosure of a misrepresentation of testimonies to Congress. It was not something that reflected on the agency as a whole, as Judge Tender was suggesting, you know, if Mr. Shulkin had said or done something and then Mr. Robinson disclosed. A disclosure that a top administration official has testified incorrectly, if not falsely, before Congress, that doesn't reflect the agency as a whole? I would say no. I would say, Your Honor, I would expect that it's admitted. If you have a secretary of, not in this case, but let's say you have a secretary of a department that misleads Congress, either through inaccurate information or deliberate falsehoods, you don't think that that doesn't reflect on the agency? And what about our cases, our line of cases like Miller v. DOJ, that doesn't build a presumption but almost builds a presumption that when you have whistleblowing disclosure statements that are being made, that, and I'll read over here, that implicated the DVA's capacities as managers and employees, as well as the DVA's perceived dissension to the Senate committee. Isn't that applicable here? Well, I think, Your Honor, that case actually is a really good example of why this is different. That implicated the VA's management, so that's a big broad thing that reflects on the entire agency as opposed to one individual's testimony. That it was not Mr. Gibson's testimony. So his, I think it's a very, very, very attenuated to suggest that Mr. Gibson would be motivated to retaliate based on that. His disclosure was that that testimony was not correct. Yes, that was his disclosure, that Mr. Shulkin's testimony allegedly was incorrect. And we have cases like Miller v. DOJ and others that indicate that at that point in time, there's, as I said, not a presumption, but I think it's pretty strong that that type of whistleblowing activities go directly against the DVA's capacities as managers and employers. It affects the entire agency, and so you have the top officials that have now a motive to retaliate. I understand, Your Honor, and I guess I would just say with all due respect, I think there is a difference between a disclosure that highlights mismanagement of an agency where, yes, another high-level agency official might sort of take that that reflects on him too and have some motivation to retaliate, versus a very specific disclosure that an individual made a statement and it's not the individual that's being alleged to be taking the retaliatory action. Thank you. Thank you, Your Honor. Thank you, Justice. Ms. Perkins, you were out of time, but I'm going to restore you to 30 minutes. Oh, okay. Thank you. I just had a few points. You know, the discussion about Mr. Gibson's credibility in Caperton, the Supreme Court reminds us that credibility aside, you don't even have to go down that road to address the credibility of the decision maker because it's not relevant. So what were the factors here that would be the counterpart of the Caperton factors, if that was some sort of campaign contribution or something, that created an inherent structural bias that simply couldn't be overlooked and that even with testimony about, oh, I never would have. Well, we would contend it's like Cinderella and City of Chicago, where you had in that case Mr. Gibson while acting and as Deputy Secretary. Well, granted, as counsel said, it started off with we'll investigate and take action if warranted. By the summer of 2014, we're in the process. This is after Secretary Shinseki was forced to resign, and it was like we are in the process of removing. And then as we revealed to The New York Times the day before even Mr. Robinson received the proposed removal, this is going to get upheld on appeal. And granted, he did deny saying those words at hearing, but he also testified he couldn't remember what he said to the reporter while not denying that he spoke to the reporter. And he also never denied his other statements to the reporter about how removing, which were quoted in that same article, how removing Mr. Gibson would allow the agency to move past the wait time scandals of 2014 and that their continued employment had served as a distraction. That's CAR-2 right there. That is a COO evidencing his motive as someone who had just received correspondence from Senator McCain in January 2016, lambasting him for the need to correct Mr. Shulkin's testimony. The VA apparently submitted corrected testimony after the fact and wanting to know when the individuals, i.e., Mr. Robinson and Mr. Curry, the persons, as he characterized, responsible for the deaths of veterans, were going to get removed. That happened in January 2016. By March, he's announcing to the press, I've done it. So this is why you need the objective looking at all the facts and circumstances and not just self-serving testimony, hearing by someone who may not even realize his subconscious bias, which is also one thing I would note. I need you to conclude. You can make a short conclusion. Okay. Otherwise. I would caution on the notoriety. As this Court is aware, in this day and age, the fake allegations that fester for years, and to hold that against my client when there was no evidence is quite a disservice. And I thank you for your time. Okay. Thank you.